**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BRANDI D. O'HARA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 10-14 |
| | ) | |
| v. | ) | Judge Alan N. Bloch |
| | ) | Magistrate Judge Cathy Bissoon |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

## I. RECOMMENDATION

It is respectfully recommended that: the Court should grant Plaintiff's Motion for Summary Judgment (Doc. 9), to the extent it seeks a remand for reconsideration by the ALJ, and deny said motion, to the extent it seeks judgment awarding benefits directly to Plaintiff; the Court should deny Defendant's Motion for Summary Judgment (Doc. 11); and, the decision of the ALJ should be vacated and the case remanded for further proceedings.

## II. REPORT

### I. BACKGROUND

Brandi D. O'Hara ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381 - 1383f ("Act"). This matter comes before the Court on cross motions for summary judgment. (Doc. Nos. 9, 11).

*A. General Background*

In light of Plaintiff's decision not dispute the findings of the ALJ with respect to her physical limitations, only those facts relevant to the resolution of Plaintiff's claims regarding her psychological limitations will be discussed. *See* ANALYSIS, *infra*.

Plaintiff was born July 13, 1983, and was twenty-five years of age at the time of the administrative hearing. (R. at 23). Plaintiff has only a seventh grade education, and was enrolled in special education classes until she left school. (R. at 23 – 24). Plaintiff was allegedly expelled twice for behavioral problems, including physical violence. (R. at 24, 246). At the time of the hearing, Plaintiff lived with a boyfriend, but contributed nothing to her household, and had not worked steadily since May of 2006, when her employment as a retail/grocery cashier beginning in 1999, ended. (R. at 119, 130 – 32). Subsequently she had held a number of jobs, but had failed to maintain them for more than several weeks at a time due to excessive absences and the inability to work with others. (R. at 119, 136, 248). Plaintiff attributed her mental state to long-term abuse by her father and ex-boyfriend, beginning at age ten and ending around age nineteen or twenty. (R. at 246 – 47).

*B. Treatment History*

Plaintiff had been receiving outpatient mental health treatment at Family Behavioral Resources. Plaintiff's primary therapist was Kay Gunner, M.S.N. The record shows that on December 28, 2005, Ms. Gunner performed an initial evaluation of Plaintiff's mental condition for Plaintiff's primary care physician, Carl Scheler, M.D. (R. at 215). Plaintiff was diagnosed as suffering from severe depression, physical abuse, dependent personality disorder, avoidant personality disorder, and problems with her social environment. (R. at 215). Plaintiff was given a global assessment of functioning ("GAF") score of 50. (R. at 215). Ms. Gunner concluded,

however, that Plaintiff's prognosis was good, because her history showed that Plaintiff was more grounded when she was seeing a therapist. (R. at 215).

By December 10, 2008, Ms. Gunner reassessed Plaintiff's mental condition to create a treatment plan. (R. at 281). At that time, Plaintiff was diagnosed with dysthymic disorder, post-traumatic stress disorder ("PTSD"), major depressive disorder without psychosis, and dependent personality disorder. (R. at 281). Plaintiff was assessed a GAF score of 54. (R. at 281). Plaintiff was recommended for weekly, individual psychotherapy. (R. at 281). Ms. Gunner noted Plaintiff may require more intensive therapy due to suicidal/homicidal ideation, worsening symptoms, and chronic substance abuse. (R. at 281). In Ms. Gunner's treatment review notes from April 20, 2009, Plaintiff consistently was noted as requiring continued work with respect to the issues identified in her earlier assessments, except that she was found to be managing her medications successfully. (R. at 297 – 99). Over the course of her treatment at Family Behavioral Resources, Plaintiff was maintained on a significant number of different medications. (R. at 289 – 90).

While at Family Behavioral Resources, Plaintiff also was evaluated by psychiatrist Praveen Pathak, M.D. on January 1, 2006. (R. at 284). He diagnosed Plaintiff with dysthymic disorder, severe major depressive disorder without psychotic features, PTSD, dependent personality disorder, and borderline personality disorder. (R. at 286). Plaintiff was assessed a GAF score of 45. (R. at 286). Plaintiff's self-described symptoms included lifelong depression, self-injurious behavior, frequent crying and mood swings, lack of energy and motivation, feelings of hopelessness and fear of her ex-boyfriend harming her severely, flashbacks of past abuse, violent and assaultive behavior towards others, and intense social anxiety. (R. at 284). However, Plaintiff denied suffering from hallucinations of any sort, and Dr. Pathak noted

Plaintiff exhibited no behavior indicative of hallucination, delusion, or response to internal stimuli. (R. at 284 – 86).

Plaintiff further reported that she had one brother and six half-brothers and half-sisters, she was abused by her ex-boyfriend from the age of ten until she was twenty, she dropped out of school due to poor scholastic performance, and she spent time in jail for assaulting her current boyfriend. (R. at 285). Dr. Pathak noted that Plaintiff showed good attention and concentration during the evaluation, however her insight was poor, judgment was average, impulse control was poor, and she suffered significant psychomotor retardation. (R. at 286). Dr. Pathak concluded that Plaintiff required medication, and that she should be monitored closely for increased irritability and aggression. (R. at 287).

On January 23, 2008, Plaintiff was evaluated by John Carosso, Psy.D. on behalf of the Pennsylvania Bureau of Disability Determination. (R. at 245). Dr. Carosso diagnosed Plaintiff as suffering from PTSD, major depressive disorder, and personality disorder. (R. at 251). Plaintiff was assessed a GAF score of 50. (R. at 251). Plaintiff was further determined to suffer marked restriction in the ability to carry out short, simple instructions, carry out detailed instructions, make judgments on simple work-related decisions, respond appropriately to work pressures in a usual work setting, and respond appropriately to changes in a routine work setting. (R. at 243). Plaintiff was moderately limited in understanding and remembering detailed instructions, interacting appropriately with the public, interacting appropriately with supervisors, and interacting appropriately with co-workers. (R. at 243).

Plaintiff reported to Dr. Carosso that she suffered mental and physical abuse by her father as a child. (R. at 246). Plaintiff also reported that she had one brother, one half-brother, and one half-sister. (R. at 246). Plaintiff required special education classes in school, and performed

poorly.  (R. at 246).  She reported that she was twice expelled from school after becoming aggressive and throwing chairs.  (R. at 246).  Plaintiff did not continue with schooling in any form after the second expulsion.  (R. at 246).  Plaintiff claimed she suffered from depression during childhood and practiced self-injurious behaviors.  (R. at 246).  She also stated that she tried to overdose on muscle relaxers at age seventeen.  (R. at 246 – 47).

Plaintiff informed Dr. Carosso that she had been abused from the age of ten until the age of twenty by her ex-boyfriend, enduring a stabbing, gunshot wound to the head, being thrown from a car, and being threatened.  (R. at 247).  Plaintiff stated that she sustained memory loss as a result of the abuse, and could not remember why her ex-boyfriend was never charged with a crime for his acts.  (R. at 247).  Plaintiff explained that she continued to fear abuse and victimization, and isolated herself from others.  (R. at 247).  Plaintiff stated that she was fired from her most recent employment because of an argument with a supervisor, and that she frequently did not show up for work.  (R. at 248).  Plaintiff believed that her psychological condition impaired her ability to work productively.  (R. at 248).  Plaintiff reported an increase in suicidal ideation.  (R. at 248).

Dr. Carosso observed that Plaintiff was cooperative, but was unable to recall some events, was dramatic in her presentation of past events, and had depressed, blunted affect.  (R. at 248).  Plaintiff did not exhibit irrational beliefs or grandiose ideas, and there was no indication that Plaintiff suffered from hallucinations.  (R. at 248).  Her intellectual functioning was average, her insight was fair, and her judgment was poor.  (R. at 248).  Dr. Carosso determined that Plaintiff suffered from anxiety, nightmares, and flashbacks due to a history of physical abuse. (R. at 250).  Her abuse prevented her from developing normal self-monitoring skills and hampered her ability interact with others in a healthy manner.  (R. at 250).  Though Plaintiff

could understand directives, her distractibility indicated that she would struggle to retain and follow through with directives. (R. at 250). Additional prompting and oversight would likely be required in a typical work setting for even simple and repetitive tasks. (R. at 250). Plaintiff's reported history of workplace volatility indicated the she had a propensity for physical aggression when she felt threatened. (R. at 250). Plaintiff exhibited few coping strategies which would allow her to manage day-to-day stress. (R. at 251).

State agency consultant Edward Jonas, Ph.D. performed a residual functional capacity ("RFC") assessment on February 11, 2008. (R. at 253 – 56). In it, he determined Plaintiff was markedly limited with respect to understanding and remembering detailed instructions, and carrying out detailed instructions. (R. at 253). Otherwise, Dr. Jonas found Plaintiff to be only moderately to not significantly limited. (R. at 253 – 56). He determined that Plaintiff had medically determinable impairments in the way of PTSD, major depressive disorder, and personality disorder. (R. at 255). Dr. Jonas concluded that Plaintiff was capable of competitive work on a sustained basis. (R. at 256). Plaintiff exhibited adequate "new learning" capacity, was able to follow a complex command and complete a task with working memory and concentration components, and had an adequate appearance and related adequately. (R. at 255). Plaintiff was capable of asking simple questions, making simple decisions, and accepting instruction. (R. at 255). Plaintiff also exhibited a low frustration tolerance. (R. at 255).

Dr. Jonas believed that Plaintiff was not as limited as Dr. Carosso had earlier determined, because she was never hospitalized due to a mental impairment, she was only in outpatient therapy, she reported taking no psychotropics other than trazadone, and Dr. Carosso's opinion relied heavily on Plaintiff's subjective complaints. (R. at 255). Dr. Carosso's assessment was

argued to be an overestimation of Plaintiff's limitations, and allegedly contained inconsistencies. (R. at 255).

On August 6, 2008, Plaintiff visited the emergency room after an attempted overdose of Restoril. (R. at 271). Plaintiff complained of stress and a problematic relationship. (R. at 271). Plaintiff claimed that she wanted help, but was tired of living. (R. at 271). It was noted that Plaintiff felt it was necessary to overdose in order to bring her need for help to her mother's attention. (R. at 274). The following day she was admitted to the hospital for a psychological evaluation. (R. at 273). While at the hospital, Hari Krishna Vemulapalli, M.D. conducted a psychiatric admission evaluation of Plaintiff.

Dr. Vemulapalli believed that an argument between Plaintiff and her mother was extremely hurtful and prompted Plaintiff's actions. (R. at 276). Dr. Vemulapalli noted Plaintiff's history of physical abuse by her father and ex-boyfriend. (R. at 276). He also noted that Plaintiff's current boyfriend was very supportive. (R. at 276). Plaintiff adamantly denied that she was suicidal or homicidal. (R. at 276). Plaintiff exhibited no signs of mania or psychosis. (R. at 276). Plaintiff's cognition was intact, and her insight and judgment were limited but fair. (R. at 276). Plaintiff was diagnosed as suffering from moderate to severe major depressive disorder and anxiety disorder. (R. at 276). Dr. Vemulapalli assessed Plaintiff a GAF score of 25/35. (R. at 277). On August 8, Plaintiff was discharged with instructions to follow up at Family Behavioral Resources for continued treatment. (R. at 275). At that time, Plaintiff was assessed a GAF score of 40. (R. at 275).

*C. Administrative Hearing*

At her hearing, Plaintiff described her childhood as depressed and abusive. (R. at 25). She claimed that she was physically and sexually abused since the age of ten. (R. at 25).

Plaintiff was allegedly locked in closets for hours on end by her ex-boyfriend. (R. at 36). Her ex-boyfriend also allegedly stabbed her in the leg. (R. at 36). Plaintiff endured this abuse until she was nineteen or twenty years of age. (R. at 37).

Plaintiff claimed that she suffered from severe depression, bipolar disorder, and anxiety issues. (R. at 26). Plaintiff went on to state that she suffered from hallucinations in the form or "demons" and evil voices/ thoughts. (R. at 26, 32). Plaintiff claimed that her doctors diagnosed her as suffering from hallucinations, and that she was hospitalized a year prior to the hearing because of hallucinations. (R. at 26). She claimed that hallucinations had plagued her over the course of her life, typically when she was having a bad day. (R. at 27, 32). Plaintiff also claimed that she would have suicidal thoughts in conjunction with the hallucinations. (R. at 32). In response to a question by the ALJ regarding why the medical notes of Plaintiff's doctors consistently noted that she did not suffer from hallucinations, Plaintiff responded that she did not inform them because her father led her to believe that she would be "put away" if she did. (R. at 37 – 38). When the ALJ asked Plaintiff how it was possible to know for sure whether Plaintiff was telling the truth, she responded that her claims have all been documented by her therapist, Ms. Gunner, and her doctors. (R. at 38).

Plaintiff went on to describe her intense fear of people and discomfort while riding in automobiles. (R. at 25). Plaintiff testified that she went through crying spells that could last up to a day. (R. at 33). Plaintiff also had racing thoughts when she tried to sleep. (R. at 33). On a good night, Plaintiff may have gotten five hours of sleep. (R. at 34). She needed to take medication to help her fall asleep, and she could not sleep during the day. (R. at 34).

Plaintiff testified that during the day she typically did nothing. (R. at 34). Plaintiff stayed in bed all day, often watching television. (R. at 34). In a normal month, Plaintiff would

not get out of bed, at all, for six or more days. (R. at 34). Plaintiff had no social activities. (R. at 34). She could go a week or two without changing clothes. (R. at 35). Her boyfriend needed to prompt her to bathe and change, and helped her to do so. (R. at 35).

Following Plaintiff's testimony, the ALJ posed the following hypothetical to the vocational expert to determine what, if any, job opportunities may be available to a person with Plaintiff's psychological limitations: light exertional activity, relegated to simple, routine repetitive tasks involving no more than incidental exercise of independent judgment and discretion – incidental being defined at all times herein as totaling up to, but not more than one-sixth of an eight hour workday, otherwise termed very little or rarely; no more than incidental change in work process; no piece work production rate pace; and, no interaction with the general public. (R. at 40).

The vocational expert responded that the following jobs would be available to such a person: "stocker," with 400,000 positions available in the national economy; "folder," with 100,000 positions; and, "assembler," with 50,000 positions. (R. at 41). The ALJ then added that the hypothetical person may miss five to six days of work per month. (R. at 41). The vocational expert replied that there would be no jobs available to such a person. (R. at 41).

## II.   ANALYSIS

### A.  Standard of Review

Judicial review of the Commissioner's final decisions on disability claims is provided by statute. 42 U.S.C. §§ 405(g) and 1383(c)(3). Section 405(g) permits a district court to review transcripts and records upon which a determination of the Commissioner is based. When reviewing a decision, the district court's role is limited to determining whether substantial evidence exists in the record to support the ALJ's findings of fact. *Burns v. Barnhart,* 312 F.3d

113, 118 (3d Cir. 2002). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)(quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. *See* 5 U.S.C. §706.

B. *Discussion*

The ALJ concluded that Plaintiff was capable of engaging in substantial gainful activity at the light exertional level on a full time basis with the following restrictions: Plaintiff is relegated to simple, routine, repetitive tasks involving no more than incidental exercise of independent judgment or discretion; Plaintiff is limited to work involving no more than incidental changes in work processes, no piece work production rate pace; and, Plaintiff is to have no interaction with the general public. (R. at 14).

Plaintiff objects to the ALJ's disability determination by first arguing that the ALJ failed to account for the finding by Dr. Carosso that Plaintiff had marked limitation in the ability to carry out short, simple instructions. (Doc. No. 10 at 15). Plaintiff further argues in her motion that the ALJ erred in failing to account for her marked inability to handle basic work stress. (*Id.* at 17). As a result of these two alleged errors, Plaintiff argues that the ALJ's RFC assessment was not reflective of Plaintiff's credibly established psychological limitations and, therefore, cannot be considered substantial evidence of the ability to engage in substantial gainful activity. (*Id.* at 15 – 18). Plaintiff made no objection to the ALJ's findings with respect to her physical limitations.

Defendant counters by claiming that the ALJ properly accounted for the credible limitations established by the record; Dr. Carosso's findings lacked credibility because these

findings relied primarily upon the subjective complaints of Plaintiff – whose own credibility is alleged to be questionable – and contain internal inconsistencies. (Doc. No. 12 at 8 – 10). Defendant argues that in light of Dr. Jonas's repudiation of much of Dr. Carosso's findings as an "overestimation" of Plaintiff's limitation, the ALJ was justified in omitting certain findings from consideration in the RFC assessment. (*Id.*).

Although an ALJ can weigh the credibility of the evidence when making a RFC determination, he or she must give some indication of the evidence which is rejected and the reasons for doing so. *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 121 (3d Cir. 2000). In "'the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" *Id.* (quoting *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981)). The ALJ "cannot reject evidence for no reason or for the wrong reason." *Morales v. Apfel*, 255 F.3d 310, 317 (3d Cir. 2000) (citing *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993)). The review of the evidence of record need not be exhaustive, but should "be accompanied by a clear and satisfactory explication of the basis on which it rests." *Fargnoli v. Massanari*, 247 F.3d 34, 41 (3d Cir. 2001); *Cotter*, 642 F.2d at 704-05. Moreover, the ALJ "should not substitute his lay opinion for the medical opinion of experts," or engage in "pure speculation" unsupported by the record. *Id.* at 318-19; *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984).

While Defendant's speculation as to the reasons for the ALJ's decision may be correct, this Court is, unfortunately, without a record to make that determination. For the most part, the ALJ's decision is relatively silent with respect to the reasoning for discussing only certain portions of Dr. Carosso's limitations findings. At no point does the ALJ even mention the findings of Dr. Jonas when formulating his RFC assessment and hypothetical. Dr. Carosso

makes numerous significant findings with respect to Plaintiff's difficulty managing tasks, workplace stress and pressure, and carrying out instructions. (R. at 243 – 44, 250 – 51). The ALJ's decision lacks any discussion that allows this Court to determine whether Dr. Carosso's findings were properly credited or discredited, or were simply ignored. *Burnett*, 220 F.3d at 121.

The ALJ does make an attempt to explain away Plaintiff's personal assertion that she has difficulty dealing with people and stress by finding that, following her alleged disability onset date, Plaintiff had managed to hold down several jobs, albeit briefly. (R. at 17). Yet, this does not explain away Dr. Carosso's findings, nor does the ALJ present evidence to refute Dr. Carosso's findings. Further, while the ALJ believes that Plaintiff's recent work history demonstrates her capacity for "some type of work activity," this is not nearly sufficient to carry the Commissioner's burden under Step 5 of showing that the Plaintiff has the capacity to engage in substantial gainful activity on a full-time basis. *See Doak*, 790 F.2d at 28.

In light of the ALJ's failure to discuss this pertinent evidence from Plaintiff's medical record, the RFC assessment – and resultant hypothetical question – is not reflective of Plaintiff's credibly established limitations, and this Court cannot find on this record that substantial evidence supports the ALJ's disability determination. *See Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir. 2002).

### III.    CONCLUSION AND INSTRUCTIONS ON REMAND

Based upon the foregoing, the ALJ failed to put forth sufficient evidence to carry the Commissioner's burden under Step 5 of the five part disability determination analysis. There is not a sufficient basis for a finding that the ALJ's decision was supported by substantial evidence. It therefore is recommended that the case be remanded for further consideration.

On remand, the ALJ should reopen the record, ensure that it is fully developed and provide adequate explanation(s) for his determinations. *See* Thomas v. Commissioner of Social Sec. Admin., -- F.3d --, 2010 WL 4643844, *2 (3d Cir. Nov. 18, 2010). If necessary to render a supportable decision, the ALJ may request from examining sources explanations, clarifications or interpretations regarding the medical reports in the record. *See* Woodrow v. Secretary of Health & Human Servs., 1990 WL 66500, *3 (N.D.N.Y. May 10, 1990). Finally, both parties must have a fair opportunity to be heard on the remanded issue(s). Thomas, 2010 WL 4643844 at *2 (remand procedure is not invitation for ALJ to offer "post hoc rationalization" for prior determination of non-disability).

In accordance with the Magistrates Act, 20 U.S.C. § 636(b)(1) (B) and (C), and Rule 72.D.2 of the Local Rules for Magistrates, objections to this Report and Recommendation are due by December 3, 2010. Responses to objections are due by December 17, 2010.


November 19, 2010                              s/Cathy Bissoon
                                               Cathy Bissoon
                                               United States Magistrate Judge

cc (via ECF email notification):

All Counsel of Record